## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

UNITED STATES OF AMERICA

    v.

████████████████████████ ,
WILKIE REYES REYNOSO, a/k/a "G,"
LAUREN SABATTUS

No. 2:24-mj-343-KFW

### CRIMINAL COMPLAINT

    I, Jonathan Duquette, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### COUNT 1
### (Possession with Intent to Distribute Controlled Substances)

    On about November 1, 2024, within the District of Maine, defendants,

████████████████████████ ,
**WILKIE REYES REYNOSO, a/k/a "G,"**
**LAUREN SABATTUS**

knowingly and intentionally possessed with intent to distribute controlled substances, including a mixture or substance containing methamphetamine, its salts, isomers, and salts of its isomers, and a mixture or substance containing N-phenyl-N- [1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

    This Complaint is based on those facts which are set forth in my affidavit of November 8, 2024, which is attached hereto and incorporated herein by reference.

_____

Jonathan Duquette
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date:  Nov 08 2024

City and state:  Portland, Maine

_Judge's signature_

Karen Frink Wolf,  U.S. Magistrate Judge
_Printed name and title_

**UNITED STATES DISTRICT COURT
DISTRICT OF MAINE**

UNITED STATES OF AMERICA

v.

████████████████████ ,
WILKIE REYES REYNOSO, a/k/a "G,"
LAUREN SABATTUS

No. 2:24-mj-343-KFW

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

I, Jonathan Duquette, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.        I am a Task Force Officer with the Federal Bureau of Investigation ("FBI").
I have been in this position since June 2015, and I have been a Task Force Officer in
FBI's Boston Division since January 2018. I am also a Border Patrol Agent with the U.S.
Border Patrol and have been in this position since December 2009. In my career, I have
investigated numerous crimes, including drug crimes.

2.        The facts in this affidavit come from my personal observations, my
training and experience, and information obtained from other agents and witnesses.
This affidavit is intended to provide the facts necessary for a determination of probable
cause for the proposed criminal complaint and arrest warrant.

**SHOWING OF PROBABLE CAUSE**

3.        I learned from my review of police reports, and from discussions with a
United States Border Patrol Agent (the "BPA"), the following, in substance and in part:

        a.        On a on about November 1, 2024, the BPA conducted a traffic stop
on a white Ford Taurus with Massachusetts license plate 6EYB18 (the "Target Vehicle")

near exit 75 on Interstate 95 northbound. The BPA first observed three people sitting in

the Target Vehicle at the Gray Service Plaza near mile marker 59 on Interstate 95.

Records checks on the Registered Owner ("RO") of the Target Vehicle showed that the

RO resided in Lawrence, Massachusetts, and that the RO had entered the United States

without inspection and was in immigration proceedings. Initially, the BPA thought the

RO was likely operating the Target Vehicle, could be in the presence of other illegal

noncitizens, and/or may have been in violation of 8 United States Code, Section 1304(e),

Failure to Carry Immigration Documents.

        b.      The BPA was dressed in uniform and was operating an unmarked

government vehicle; however, the vehicle was identifiable as a law enforcement vehicle;

for example, the front seats were divided from the rear passenger compartment by a

cage-style divider suitable for transporting prisoners, and the vehicle has Department of

Homeland Security license plates. After the BPA had observed the scene for

approximately ten minutes, the three occupants of the Target Vehicle exited the vehicle.

The three occupants attempted to inconspicuously look towards the BPA's location as

they went into the service plaza.

        c.      After approximately 25 to 35 minutes, one of the vehicle occupants,

believed to be a female returned to the Target Vehicle and crouched down next to it. Five

to ten minutes later, the other two occupants returned to the Target Vehicle. After

several minutes the Target Vehicle backed out of its parking space, hesitated for several

seconds, then pulled back into the same parking space. The Target Vehicle ultimately

backed out of its parking space and proceeded straight to the Burger King drive through

at the service plaza. The BPA observed the occupants of the Target Vehicle as they drove

past and they appeared rigid, were looking straight ahead, and the front seat passenger

2

appeared wide eyed. Based on his training and experience, the BPA interpreted this observed behavior as highly suspicious and characteristic of individuals who were nervous.

d. The BPA's suspicions were further raised because the occupants of the Target Vehicle had spent approximately half an hour inside the service plaza and then decided to go through the drive through. The BPA suspected that this behavior indicated that the occupants of the Target Vehicle were engaged in criminal activity, that they had spotted the BPA, and that they were trying various methods to avoid him. The BPA further knew from his experience that Lawrence, Massachusetts is a major drug source city for Maine; the BPA was familiar with ongoing law enforcement efforts to stem the tide of drug trafficking from Lawerence to points in Maine by Trinitario gang members—an international street gang with ties to the Dominican Republic. Based on their behavior, the nationality of the RO, and the registration of the Target Vehicle, the BPA suspected that occupants of the Target Vehicle were transporting illegal drugs.

e. After going through the drive through, the Target Vehicle parked behind the BPA's vehicle for a few seconds. A female passenger got out of the Target Vehicle and opened the trunk. She rummaged in the trunk for a short time before returning to the passenger compartment. The Target Vehicle departed the service plaza heading north on Interstate 95.

f. The BPA maintained a short distance behind the Target Vehicle and observed at least three lane changes without the use of a blinker, as well as observable fluctuations in speed by the Target Vehicle. The BPA conducted a traffic stop just past exit 75. The BPA first spoke with the rear seat passenger who was later identified as LAUREN SABATTUS, the defendant. SABATTUS had the hood of her sweatshirt

3

clinched tightly over her head and face, but the BPA was able to see sores on her face that, consistent with his training and experience, the BPA believed resulted from drug use. The driver and front seat passenger stared straight ahead and did not acknowledge the BPA after he identified himself in English and Spanish. The front seat passenger was sweating and breathing heavily.

g.       Eventually the driver produced a driver's license that identified him as WILKIE REYES REYNOSO, the defendant. The front seat passenger provided a Massachusetts driver's license that identified him as ████████████████████,
the defendant. ████████ produced an Interim Notice Authorizing Parole when asked for immigration documents. The BPA conducted records checks on the occupants of the vehicle and requested a canine from the Maine State Police or Androscoggin County Sheriff's Office. Although the BPA did not immediately notice, he found ████████ resided at the same Lawrence address as the RO of the Target Vehicle.

h.       After approximately 30 minutes, an Androscoggin County Sheriff canine arrived to assist. The canine officer requested the BPA have the occupants exit the vehicle in order to allow for the canine sniff, and for officer safety during the search. Instead of complying with the BPA's request, the occupants rolled up the windows, locked the doors, and refused to exit the vehicle. After approximately five to ten minutes, SABUTTUS exited the vehicle and said she wanted nothing to do with REYES and ████████. REYES exited next, followed by ████████. During a *Terry* frisk of REYES, officers located a syringe. After all occupants exited the vehicle, the canine conducted a free air sniff of the vehicle. The canine officer told the BPA that his canine alerted to a trained odor in the rear passenger compartment of the Target Vehicle.

4

       i.       Due to the heavy traffic volume on Interstate 95 at that time, a wrecker was called to move the Target Vehicle to a safe location to conduct a physical search. The Target Vehicle was transported under law enforcement observation to the Park and Ride located at 1243 Lisbon Street, Lewiston.

       j.       During the search of the Target Vehicle, several dozen syringes and other drug paraphernalia were found. Approximately five loose handgun rounds were found in the glovebox. In a shopping bag in the trunk, the BPA found what appeared to be large quantities of methamphetamine and fentanyl.

4.      I know from my participation in the investigation that law enforcement conducted field analysis of the controlled substances. The suspected methamphetamine provided a presumptive positive test for methamphetamine and the suspected fentanyl tested inconclusive. A second test of the suspected fentanyl yielded a presumptive positive result. Later the weight of the suspected methamphetamine was determined to be approximately 464 grams and the suspected fentanyl was determined to be approximately 186 grams.

5.      I conducted separate *Mirandized* interviews of SABATTUS, REYES, and ███████. Each provided a narrative describing their travels that was inconsistent with their companions'. None claimed ownership of the drugs recovered from the trunk, and all denied knowing the drugs were in the vehicle. SABATTUS admitted to being a user of methamphetamine. SABATTUS explained that she collects syringes from friends' houses. REYES admitted to using methamphetamine in the vehicle several hours earlier. SABATTUS admitted that REYES was her boyfriend, and that she referred to him as "G."

6.      In addition to the contraband described above, a total of four cellular phones and one SIM card were found during the search of the vehicle and/or during the search of its occupants. I subsequently obtained judicially authorized warrants to search these devices for evidence of drug trafficking activity by SABATTUS, REYES, ████████Z, and their associates.

7.      I have reviewed electronic messages recovered from SABATTUS's cellular phone. I identified that phone as belonging to SABATTUS from, among other indicia, the email address associated with the phone ("lsabattus.itpd@gmail.com"), and from the device name ("lauren sweetie sabattus"). Among other messages resident on the phone, I have reviewed the following conversation which took place earlier in the day on November 1, 2024, between SABATTUS and REYES, identified as "G."

| TIME STAMP[1] | REYES | SABATTUS |
|---|---|---|
| 4:23:00 | What do you want from the truck[2] | |
| 4:23:06 | Everything im assuming | |
| 4:23:10 | | Uhm what?? |
| 4:23:21 | We're going in the white car | |
| 4:23:26 | | K |
| 4:23:28 | | And yup. |
| 4:23:34 | | I'll move it all. don't worry. |
| 4:23:48 | | Lemme know when the white car is at |

---

[1]      Note that the times reflected here are listed in Coordinated Universal Time ("UTC"), consistent with the records associated with the device. On November 1, 2024, UTC was four hours ahead of Eastern Daylight Time ("EDT"). For example, a message sent at 4:23 a.m. UTC was sent at 12:23 a.m. EDT.

[2]      All spelling, grammar, and similar errors are reflected in the original messages.

6

| Time | | |
|---|---|---|
| | | the truck |
| 4:23:51 | | I'll switch it over |
| 4:24:06 | Okay | |
| 4:24:12 | Are you good? | |
| 5:03:38 | | Thanks for letting me know y'all were ready |
| 5:05:11 | We're upstairs weighing the ice up | |
| 5:05:17 | So no not ready | |
| 5:05:22 | Come up here if you want | |
| 5:05:38 | Get all our stuff out of the truck if you can | |
| 5:08:46 | | Wtf? |

8.     I believe that the conversation reflected above concerns preparations that
SABATTUS and REYES were making for their drug trafficking trip to Maine later that
day. I know based on my training and experience that drug traffickers often refer to
methamphetamine (or "crystal meth") as "ice" because of its crystalline appearance.

9.     I have reviewed a second device recovered from the Target Vehicle. I have
identified this device as belonging to REYES, based on, upon other indicia, the device
name ("G") and multiple selfie-style photographs which I recognize depict REYES,
based on my personal interaction with him. The call number associated with REYES's
device is the same call number associated with the contact identified as "G" who
participated in the messages depicted above.

10.     I have reviewed a third device recovered from the person of ███████
during the stop. On ████████'s phone, I identified a number of images of what appear
to be significant quantities of controlled substances, including fentanyl. I learned from

7

my review that ▇▇▇▇▇ shared a video depicting a distribution quantity of what I believe to be fentanyl with a contact listed as "Grego 2," associated with a 207 phone number. On about November 1, 2024, several hours in advance of the traffic stop, "Grego 2" texted ▇▇▇▇▇ with an address in Lewiston. A few hours later, ▇▇▇▇▇ responded to "Grego 2" by texting his full true name. At approximately 5:13 p.m. EDT—during the pendency of the traffic stop—▇▇▇▇▇ appears to have shared a screenshot of his Waze navigation application, which depicted ▇▇▇▇▇'s location on I-95 overlapping with the Waze icon denoting the presence of police. According to the screen shot, ▇▇▇▇▇ was located approximately 7 minutes away from what appears to be the Lewiston address previously provided by "Grego 2."

## CONCLUSION

11.     I respectfully submit, based on the facts set forth above, that probable cause exists to charge ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, WILKIE REYES REYNOSO, a/k/a "G," and LAUREN SABATTUS, the defendants, by Criminal Complaint with the offense of distribution and possession with intent to distribute controlled substances, including a mixture or substance containing methamphetamine, its salts, isomers, and salts of its isomers, and a mixture or substance containing N-phenyl-N- [1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), in violation of Title 21, United States Code, Section 841(a)(1), and request that the accompanying Criminal Complaint be issued.

Jonathan Duquette
Task Force Officer
Federal Bureau of Investigation

8

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date:  Nov 08 2024

City and state:  Portland, Maine

_____
Judge's signature

Karen Frink Wolf,  U.S. Magistrate Judge
Printed name and title

9